**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DWAYNE SHEARDER ECCLES and | ) | |
| PRISKA JOLANKA ECCLES, | ) | Case No. 07-30694 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| LARRY J. FEE and BRENDA FEE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 08-3002 |
| | ) | |
| DWAYNE SHEARDER ECCLES and | ) | |
| PRISKA JOLANKA ECCLES, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| PATRICIA A. BROWN, Chapter 7 Trustee | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | Adversary No. 08-3009 |
| | ) | |
| LARRY J. FEE and BRENDA FEE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

These two adversary proceedings were consolidated for trial because they arise from a common nucleus of operative facts. In a nutshell, Larry and Brenda Fee contend that the Debtors committed fraud by borrowing $120,000 for one purpose – renovating six houses which were subject to deeds of trust in favor of the Fees – and using that money for purposes unrelated to the renovation project, including the improvement of other real property the Debtors owned, the payment of general living expenses, and the purchase of luxury items. The adversary initiated by the Fees seeks a determination that the debt arising from that fraud is nondischargeable under 11 U.S.C.

§ 523(a)(2)(A)[1] and requests the imposition of an equitable lien or constructive trust on the Debtors' "Lake Point Property" to assist them in collecting that debt. The adversary proceeding brought by the Chapter 7 trustee seeks damages for the impairment ("slander") of title that resulted from a *lis pendens* recorded by the Fees on the Lake Point Property in connection with a prepetition state-court lawsuit the Fees filed against the Debtors. The Trustee also seeks to avoid the filing of the *lis pendens* as a preferential transfer under 11 U.S.C. § 547(b).

The Court conducted a trial on this matter on June 26, 2008. The following memorandum opinion constitutes the Court's findings of fact and conclusions of law.

## BACKGROUND[2]

Dwayne and Priska Eccles moved to southwest Missouri from California in December 2005. Prior to moving to Missouri, the Debtors purchased two pieces of property in the Branson area: one located at 23 Lake Point Lane, Galena, Missouri (the "Lake Point Property"), and one located in Kirbyville, Missouri. They moved into the Lake Point Property and rented out the Kirbyville Property.

The Debtors met Larry and Brenda Fee at a Christmas party shortly after the Debtors moved to Missouri, and the two couples became fast friends. Brenda Fee testified that she and her husband came to feel that the Debtors were "like our own children." They also shared a common interest – investing in real estate. The Fees owned numerous properties, and the Debtors had taken a seminar in real estate investing, and at that time they owned property in Kansas, Las Vegas, and Missouri.

In May 2006, the Debtors bought six properties located on Old Highway 160, in Reeds Spring, Missouri (the "Reeds Spring Properties") from a man named Tuffy Hamilton for approximately $185,000. They made a $20,000 down payment, and BKW Mortgage (an entity owned or controlled by Tuffy Hamilton) financed the balance. Priska Eccles testified that the Debtors bought the Reeds Spring Properties for the purpose of fixing up the dilapidated houses on

---

[1] The Fees orally abandoned their claims under 11 U.S.C. § 523(a)(4) and (6) at the commencement of the trial.

[2] The parties filed a "Stipulation to Uncontroverted Facts" in addition to the testimonial and documentary evidence offered. The facts contained in the stipulation are woven into the Court's narrative account of the relevant factual background.

2

the properties and reselling them. Based on estimates the Debtors obtained from Big Daddy's Maintenance Services, run by Barry Copilevitz, the Debtors believed that it would take approximately $120,000 to sufficiently renovate the Reeds Spring Properties for resale.[3]

The Debtors explored conventional financing for the renovation of the Reeds Spring Properties (the "Renovation Project") with the assistance of Pamela Barry, a longtime friend of and mortgage broker for the Fees, but those efforts were unsuccessful and the Debtors eventually decided to seek private financing. Priska Eccles and Ms. Barry testified that the Debtors decided against conventional financing because conventional construction loans (supposedly) require a borrower to expend the borrower's own funds first and then seek reimbursement for specific expenses. The Debtors didn't have enough money to front expenditures for the Renovation Project, so, on Ms. Barry's suggestion, the Debtors entered into discussions with the Fees for a loan to fund the Renovation Project. The Fees and Ms. Barry, who helped structure the transaction with the Debtors, testified that it was clear from the parties' discussions that the sole purpose of the proposed $120,000 loan from the Fees was to renovate the Reeds Spring Properties.

The structure of the loan transaction between the Fees and the Debtors was tailored to the specific needs of the Renovation Project. The Debtors and the Fees anticipated that it would take approximately one month and $20,000 to renovate each house. So the Debtors executed six, six-month promissory notes for $20,000. Each note was secured by a separate deed of trust on one of the houses to be renovated. Priska Eccles testified that they structured the transaction this way so that the Debtors could sell each house as it was completed without recording a new deed of trust. The Debtors signed the promissory notes on November 6, 2006. The notes matured on May 31, 2007.

Despite the attention paid to structuring the loan to align with the needs of the Renovation Project, the Debtors immediately began using the proceeds from the loans ("Loan Proceeds") on expenditures unrelated to the Renovation Project. On the date the Debtors received the Loan Proceeds ($114,563.86 after closing costs), the Debtors had approximately $6,500 in the bank and no other income. However, by the end of November 2006, the Debtors had spent more than

---

[3] It is unclear from the testimony exactly how the Debtors came up with the $120,000 figure. The written estimates in evidence totaled only $99,241.54. However, the Debtors and the Fees testified that they all believed the total for renovating the Reeds Spring Properties would be about $120,000.

$31,000. Of this amount, no more than $13,000 was used on the Renovation Project. The rest was used for general living expenses, including health insurance, mortgage payments on other properties, automobile loans, and child care. From the end of November 2006 to March 2007, it appears that the Debtors devoted little or no money to the Renovation Project with the exception of approximately $1,000 spent on carpeting in March. The Debtors testified that the Renovation Project had to be put on hold because sometime around Thanksgiving the contractor, Barry Copilevitz, broke his toe. Nevertheless, the Debtors continued spending the Loan Proceeds. In December 2006 they spent $42,000. Their purchases during December included toys for their children, eating out, groceries, more mortgage payments, a new roof on the Lake Point Property, a down-payment on a new home located at 330 Meadow Ridge N., in Branson, Missouri ("Meadow Ridge Property"), and furniture for their new home. In January 2007, the Debtors spent another $19,000, including $1,679 on a large screen television, and $1,584 on furniture for the Meadow Ridge Property. They spent about $19,000 in February, and by March the Debtors had essentially run out of money.

Sometime in March, Larry Fee stopped by the Reeds Spring Properties to check on the progress of the Renovation Project. Prior to that, he had been told that things were moving along, but when he inspected the project he discovered that only one house had been finished, one house was near completion, and the other houses were still "in shambles." Larry Fee testified that Dwayne Eccles told him at that time that they were behind schedule but that it was "okay" because the Debtors would just get an extension of the maturity date for the loans.

However, on April 27 the Debtors told the Fees that they could not finish the Renovation Project and that they had no intention of repaying the money they owed the Fees. Shortly thereafter, on May 1, 2007, the Fees responded by filing a lawsuit against the Debtors in the Circuit Court of Stone County, Missouri alleging fraud and seeking the imposition of a constructive trust on other properties owned by the Debtors, including the Lake Point Property. Contemporaneously with the filing of the lawsuit, the Fees had the Stone County Recorder of Deeds record a notice of *lis pendens* on the Lake Point Property.

The Debtors filed for protection under Chapter 7 of the Bankruptcy Code on September 29, 2007.

**DISCUSSION**

The Court begins with the issues raised in the Fees' Amended Complaint (Adv. No. 08-3002) and proceeds with the issues raised in the Trustee's Complaint (Adv. No. 08-3009).

**1.    The Debtors' debt to the Fees is nondischargeable under 11 U.S.C. § 523(a)(2)(A).**

The Fees contend that the debt arising from the Debtors' alleged fraud is nondischargeable under 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) excepts from discharge "any debt or money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by– (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[4] Although the statute speaks of three ostensibly separate torts – false pretenses, false representation, and actual fraud – most courts, including this one, analyze all § 523(a)(2)(A) claims under a "single action test" for actual fraud.[5]  To prove actual fraud, a creditor must prove the following by a preponderance of the evidence:[6] (1) the debtor made a false representation; (2) at the time the representation was made the debtor knew it was false; (3) the debtor subjectively intended to deceive the creditor at the time he made the representation; (4) the creditor justifiably relied upon the representation; and (5) the creditor was damaged.[7] The Court finds that the Fees proved all of these elements.

**a.    The Debtors falsely represented that they were going to use the Loan Proceeds solely for the Renovation Project.**

The Debtors do not deny that the primary purpose of the loan was to pay for the renovation of the Reeds Spring Properties. They admit discussing that with the Fees. What the Debtors deny, however, is that they ever represented that renovating the Reeds Spring Properties was the "only" purpose of the loan or that they wouldn't use the Loan Proceeds for any other purpose.

This explanation is unsatisfactory for two reasons.

---

[4] 11 U.S.C. § 523(a)(2)(A).

[5] *See In re Eggleston*, 243 B.R. 365, 372-73 (Bankr. W.D. Mo. 2000) (citing *AT & T Universal Card Services v. Alvi* (*In re Alvi*), 191 B.R. 724, 729 (Bankr. N.D. Ill. 1996).
The Court does note, however, that the case for excepting the Eccles' debt to the Fees from discharge based on the tort of false pretenses, which requires only "an implied misrepresentation or conduct intended to create or foster a false impression," would be even stronger under these facts. *See F.C.C. National Bank v. Etto* (*In re Etto*), 210 B.R. 734, 735-36 (Bankr. N.D. Ohio 1997) (defining false pretense for purposes of § 523(a)(2)(A)).

[6] *Grogan v. Garner*, 498 U.S. 279, 290, 111 S.Ct. 654, 660, 112 L.Ed.2d 755 (1991).

[7] *In re Pickett*, 234 B.R. 748, 753 (Bankr. W.D. Mo. 1999).

First, the Debtors are misguided in their belief that their alleged silence on their intent to use the Loan Proceeds for other purposes means they didn't make a fraudulent representation. It is well established that a debtor's silence regarding a material fact can constitute a false representation actionable under § 523(a)(2)(A).[8] "A borrower has the duty to divulge all material facts to the lender. . . .While it is certainly not practicable to require the debtor to 'bare his soul' before the creditor, the creditor has the right to know those facts touching upon the essence of the transaction."[9]

The Debtors' intended use of the Loan Proceeds most definitely touched upon the essence of the transaction, especially in light of the fact that the Debtors knew and informed the Fees that it was going to cost $120,000 – the precise amount of the loan – to renovate the Reeds Spring Properties.

Second, the Court simply finds the Fees' testimony on this issue more credible. The Fees testified that it was clear from their conversations with the Debtors that the Loan Proceeds were going to be used solely to renovate the Reeds Spring Properties. There was never any discussion of the Debtors' using the money for their personal needs or expenses. Thus, the first element of actual fraud has been met.

  b. **The Debtors knew at the time they represented to the Fees that they were going to use the Loan Proceeds for the Renovation Project that they intended to use the funds for other purposes.**

Priska Eccles admitted on the witness stand that she intended all along to use the Loan Proceeds for purposes other than the renovation of the Reeds Spring Properties, and the Debtors' rapid depletion of the Loan Proceeds corroborates that admission. This admission is sufficient to satisfy the second prong of actual fraud, *i.e.*, that the Debtors knew at the time they made a fraudulent representation that the representation was false.

  c. **The Debtors intended to deceive the Fees.**

In the absence of direct evidence of fraudulent intent, which rarely exists, courts look to

---

[8] *See Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, 1288 (8th Cir. 1987) (fraudulent representations may be by omission or commission) (citations omitted), abrogated on other grounds, *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

[9] *Id.*

surrounding circumstances to ascertain intent.[10] Here, the circumstances surrounding the transaction between the Fees and the Debtors supply ample evidence that the Debtors intended to deceive the Fees.

The most striking evidence of the Debtors' fraudulent intent is the speed with which the Debtors depleted the Loan Proceeds on expenditures unrelated to the renovation of the Reeds Spring Properties despite the fact that most or all of the Loan Proceeds were necessary for the Renovation Project. The Debtors spent more than $73,000 within 60 days of receiving the Loan Proceeds, and only $13,000 of that was spent on the Renovation Project. The Debtors' spending spree reached an audacious height when the Debtors used the Loan Proceeds to put a down payment on another house and to purchase appliances – including a large screen television– for the new house. By the end of February, almost all of the Loan Proceeds had been spent, but only one of the six houses on the Reeds Spring Properties was renovated.

The speed with which the Debtors used the Loan Proceeds, combined with the types of purchases the Debtors made with the Loan Proceeds, leaves the Court with the inescapable impression that the Debtors intended all along to use the Loan Proceeds for their personal use. This wasn't simply a case of occasionally dipping into the Loan Proceeds to make ends meet while the Debtors devoted all of their energy toward renovating the Reeds Spring Properties. After the Debtors received the Loan Proceeds, the Debtors immediately began using the Loan Proceeds to maintain, and even improve, their lifestyle. The Debtors knew that the Fees wouldn't loan them money for that purpose, so they kept their intentions silent and convinced the Fees to lend them $120,000 on the false premise that the Loan Proceeds would be used solely to renovate the Reeds Spring Properties.

Debtor Priska Eccles testified that the reason the Debtors didn't use a conventional construction loan to fund the Renovation Project was because conventional construction loans require a borrower to expend the borrower's own funds first and then reimburse himself or herself with draws restricted to the specific expenditure, and the Debtors didn't have the funds to advance for expenditures. Although there might be some truth to this explanation, the Court is more inclined

---

[10] *In re Beza*, 310 B.R. 432, 436 (Bankr. W.D. Mo. 2004) (citing *In re Newell*, 164 B.R. 992, 996 (Bankr. E.D. Mo.1994); *Supercom, Inc. v. Levitsky* (*In re Levitsky*), 137 B.R. 288, 291 (Bankr. E.D. Wis. 1992); *Kline's Service Center, Inc. v. Fitzgerald* (*In re Fitzgerald*), 109 B.R. 893, 897 (Bankr. N.D. Ind. 1989).

to believe that the primary reason the Debtors didn't use conventional financing is that they knew they wouldn't be able to redirect the proceeds as easily as they did with the loan from the Fees.

In the end, the preponderance of the circumstantial evidence supports a finding that the Debtors intended to defraud the Fees, thus satisfying the third prong of actual fraud.

### d. The Fees justifiably relied on the Debtors' representation that the Loan Proceeds would be used solely for the Renovation Project.

Under § 523(a)(2)(A), it is not necessary that a creditor's reliance on a debtor's misrepresentation be reasonable, it only needs to be "justifiable."[11] Justifiable reliance is a less demanding standard than reasonable reliance and is derived from the common law rule that a victim's contributory negligence is not a defense to an intentional tort.[12] Justifiable reliance does not require an investigation, even if the failure to investigate would be considered negligent and the falsity of the representation would be readily discoverable upon an investigation.[13] A creditor is not allowed, however, to turn a blind eye to clear warnings he is being deceived.[14] Applying this standard, the Court finds that the Fees justifiably relied on the Debtors' representation that the Loan Proceeds were to be used solely for the Renovation Project.

The Fees testified that at the time they made the $120,000 loan to the Debtors, they did not suspect that the Debtors needed it for their daily living expenses. The Fees knew that money was tight for the Debtors, since the Fees had just recently loaned them $5,000, but they believed that Dwayne Eccles either had, or hoped to have, full time employment with United Parcel Service (U.P.S.). As time progressed, and the Fees had additional contact with the Debtors, the Fees probably should have suspected that the Debtors were living off of the Loan Proceeds. But the Fees' subsequent knowledge (actual or constructive) that the Debtors weren't using the Loan Proceeds solely for the Renovation Project is irrelevant to whether the Fees' reliance on the Debtors' representations was justifiable at the time the Fees made the $120,000 loan to the Debtors.

---

[11] *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

[12] *Sanford Institution for Savings v. Gallo*, 156 F.3d 71, 74 (1st Cir.1998).

[13] *Mans*, 116 S.Ct. at 444.

[14] *Id*. (citations omitted).

Therefore, the Court finds that the fourth prong of the test for actual fraud has been met.

### e. The Fees suffered more than $120,000 in damages.

The Debtors fraudulently induced the Fees to loan them a total of $120,000, to be repaid in six months with 15.5 % interest. Under the terms of the promissory notes the Debtors signed, the Debtors were obligated to make monthly payments of $1,564.40. Approximately $1,548 of that amount went to interest and $16.00 toward reducing the principal. The Debtors made (substantially) five payments on the loan (the fifth payment was short $45) before they told the Fees on April 27, 2007, that they did not intend to repay the loan. The small reduction in principal is dwarfed by the amount of interest that has accrued since that time. Moreover, the promissory notes memorializing the Debtors' obligations to the Fees provide for the reasonable attorney's fees expended in recovering the amounts due under the notes. Therefore, the damages the Fees incurred as a result of the Debtors' fraud well exceed $120,000.[15]

### 2. The Fees are not entitled to an equitable lien or constructive trust on the Lake Point Property.

The Fees' request for an equitable lien or constructive trust on the Lake Point Property is premised on the assertion that the Debtors used Loan Proceeds for the improvement of that property. The Fees' request must be denied for several reasons.

First, the Fees are not entitled to either remedy – an equitable lien or a constructive trust – because both remedies are equitable remedies which require a showing that there is no adequate remedy at law,[16] and the Fees have not alleged or established why a money judgment is not adequate. The Court could deny the Fees' claim for a constructive trust or equitable lien on this basis alone.

Second, a party seeking to impose an equitable lien under Missouri law must establish: 1) the existence of an obligation, 2) a res to which that obligation fastens and which can be identified,

---

[15] Upon entry of this memorandum opinion, the Fees shall promptly file an affidavit setting forth the precise amount the Debtors owe the Fees, including a statement setting forth in detail the attorney's fees expended to collect this obligation.

[16] *See Wilkinson v. Tarwater*, 393 S.W.2d 538, 542 (Mo. 1965).

and 3) an intent, express or implied, that the property serve as security for the payment of that obligation.[17] The Fees are not entitled to an equitable lien on the Lake Point Property because they failed to establish the third element – *i.e.*, that the Fees or the Debtors intended for the Lake Point Property to serve as security for the payment of the $120,000 loan from the Fees.

Finally, the Fees' claim for a constructive trust fails because it is not the appropriate remedy for the relief the Fees seek. Unlike equitable liens, which attach to a defendant's property in a particular amount, constructive trusts are designed to divest a defendant of title to property wrongfully obtained from a plaintiff.[18] The Fees, however, have not alleged that the Debtors obtained title to the Lake Point Property with the Loan Proceeds; they claim only that the Debtors used some of the Loan Proceeds to improve that property. The Fees' claim for a constructive trust fails in the absence of an allegation or proof that the Debtors used the Loan Proceeds to wrongfully acquire title to the Lake Point Property.

**3.      The Fees have an absolute defense to the Trustee's slander of title claim.**

The Trustee argues that the Fees' filing of the *lis pendens* "slandered" the Debtors' title to the Lake Point Property and hindered the sale of the property. However, Missouri law provides an absolute defense to a slander of title action for notices of *lis pendens* where the *lis pendens* bears a reasonable relationship to a civil suit making equitable claims involving real estate.[19] Here, the *lis pendens* the Fees recorded on the Lake Point Property bears a direct relationship to the civil suit they filed in the Circuit Court for Stone County, Missouri (Case No. 07SN-CC00053), because that civil suit alleged, as the Fees have asserted in this Court, that a constructive trust should be imposed on the Lake Point Property because the Debtors used the Loan Proceeds to make improvements on that property when they were obligated to use that money for the Renovation Project.

---

[17] *See Commerce Bank, N.A. v Tifton Aluminum Co., Inc.* (*In re Win-Vent, Inc.*), 217 B.R. 803, 809-10 (Bankr. W.D. Mo. 1997) (citing *Fredco Realty, Inc. v. Jones*, 906 S.W.2d 818, 822 (Mo. Ct. App. 1995)).

[18] *See Checkett v. McGehee, et.al.* (*In re McGehee*), 342 B.R. 587, 590-91 (Bankr. W.D. Mo. 2006).

[19] *Jeffrey v. Cathers,* 104 S.W.3d 424, 429 (Mo. Ct. App. 2003) ("The only case where an absolute privilege has been found against a slander of title action involves a notice of lis pendens under Section 527.260 . . . in a civil suit making equitable claims involving real estate, the recordation of which is absolutely privileged when the notice has a reasonable relation to the action filed.") (citing *Houska v. Frederick*, 447 S.W.2d 514, 518-19 (Mo. 1969).

The Trustee's argument that the *lis pendens* on the Lake Point Property did not bear a reasonable relationship to the Fees' state court lawsuit because the petition initiating it did not specifically state that the Debtors used the Loan Proceeds to improve the "Lake Point Property," but instead stated that the Debtors used the funds to improve "other property" owned by the Debtors, is without merit. The paragraph in the Fees' state court petition immediately following the allegation that the Debtors misused the Loan Proceeds specifically identifies the Lake Point Property (by legal description) as one of the "other" properties owned by the Debtors. Missouri may be a "fact pleading" state (as opposed to the Federal system of "notice pleading"), but a state-court petition is still "accorded all reasonable inferences fairly deductible (sic) from the facts stated."[20] A reasonable inference deducible from the Fees' state court petition is that the Debtors used the Loan Proceeds to improve the Lake Point Property. Hence, the Fees' state court lawsuit bore a reasonable relationship to the notice of *lis pendens* recorded on the Lake Point Property and therefore did not slander the Debtors' title to that property.

**4.    The *lis pendens* is not avoidable as a preference under 11 U.S.C. § 547(b).**

To avoid the *lis pendens* as a preference under § 547(b), the Trustee must prove, among other things, that the transfer either occurred "on or within 90 days before the date of the filing of the (bankruptcy) petition" or "between 90 days and one year before the date of the filing of the petition, *if such creditor at the time of such transfer was an insider. . . .*"[21] The Fees recorded the *lis pendens* on May 1, 2007 – 151 days before the Debtors filed their bankruptcy petition on September 29, 2007. Therefore, the only way the Trustee can avoid the *lis pendens* as a preference is to establish that the Fees were insiders of the Debtors subject to the one-year look-back period.[22]

The Bankruptcy Code's definition of "insider" in 11 U.S.C. § 101(31)(B) is illustrative, not exclusive. With respect to an individual, an insider includes a relative of the debtor or of a general partner of the debtor; a partnership in which the debtor is a general partner; a general partner of the

---

[20] *State ex rel. United Industries Corp. v. Mummert*, 878 S.W.2d 494, 496 (Mo. Ct. App. 1994).

[21] 11 U.S.C. §547(b)(4)(A) and (B) (emphasis added).

[22] The Trustee bears the burden of proving every element of 11 U.S.C. § 547(b).

debtor; or a corporation of which the debtor is a director, officer, or person in control.[23] Outside of these statutorily defined categories, courts look to whether a creditor's relationship with the debtor is so close that his or her conduct should be subject to closer scrutiny than those dealing at arm's length with the debtor.

> An insider is one who does not deal at arm's length with the debtor. Involvement in the day-to-day business of a debtor may elevate a creditor to insider status. However, the creditor would have to exert control over the debtor before gaining insider status. The ability of a creditor to compel payment of a debt is insufficient control to render the creditor an insider. In ascertaining insider status, the closeness of the relationship between the parties is also relevant.[24]

The Trustee claims that the Fees were insiders of the Debtors because the Fees were close personal friends of the Debtors and because they "purported to exercise dominion and control over the Loan Proceeds restricting its [*sic*] use to the specific purpose for which the loans were purportedly made."[25] The evidence adduced at trial fell far short of establishing that the Fees were insiders of the Debtors. The fact that a creditor and a debtor are friends is insufficient to transform the creditor into an insider; some degree of control or significant influence is necessary, and the Trustee offered absolutely no evidence that the Fees exercised control over, or significantly influenced the behavior of, the Debtors. In fact, it was the Fees' very lack of control and influence over the Debtors that led to this lawsuit in the first place; if the Fees had had control over the Debtors, they most certainly would not have let them use the money for any other purpose than to renovate the Reeds Spring Properties. Brenda Fee also testified that her relationship with the Debtors became more distant after she and her husband loaned them money – further undermining the Trustee's contention that the Fees' close relationship with the Debtors made them insiders for purposes of § 547(b)(4)(B).

Because the Court finds that the Fees were not insiders of the Debtors, the Trustee cannot avoid the *lis pendens* as a preferential transfer under § 547(b) because it did not occur within 90 days before the Debtors' bankruptcy petition as required by § 547(b)(4)(A).

---

[23] 11 U.S.C. § 101(31)(A).

[24] *See In re Rosen Auto Leasing, Inc.*, 346 B.R. 798, 804 (B.A.P. 8th Cir. 2006) (copious citations omitted).

[25] Trustee's Complaint (Adversary No. 08-3009), at ¶ 42-43.

**5.    The amount of the Fees' damages.**

The Fees conceded at trial that they are not entitled to a judgment of nondischargeability as to any moneys that were actually spent by the Debtors on the Renovation Project because that was, after all, the purpose for which the original loan was made. Inexplicably, the Debtors did not adduce any evidence whatsoever of the amount they had spent on the Renovation Project. The evidence adduced by the Fees, as discussed above, showed that only $14,000 of the $120,000 had been spent on the Renovation Project. Therefore, the Fees are entitled to a judgment of nondischargeability as to $106,000, plus interest from May 1, 2007 at the contractual rate of 15.5% and their attorney's fees incurred in the state court and in this court in the collection of their note.

## CONCLUSION

In the end, the only claim that prevails in this consolidated proceeding is the Fees' claim for a determination that the debt owed to them by the Debtors is nondischargeable under 11 U.S.C. §523(a)(2)(A).[26] The Fees are entitled to a judgment of nondischargeability as to $106,000, plus interest from May 1, 2007 at the contractual rate of 15.5% and their attorney's fees incurred in the state court and in this court in the collection of their note.

A separate order consistent with this Memorandum Opinion will be entered pursuant to Fed. R. Bankr. P. 9021.

ENTERED this 23rd day of July 2008.

                                                    /s/   Jerry W. Venters
                                                    United States Bankruptcy Judge

A copy of the foregoing mailed electronically or
conventionally to:
Lee J. Viorel, III
Angela D. Acree
Danny R. Nelson

---

[26] This tale also confirms two pieces of common wisdom: 1) never lend or borrow money to or from friends and real estate investing is never as easy as it looks on television.

14